UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

HORACE HAMPTON,

                    Petitioner,

      - against -

WILLIAM LEE,

                    Respondent.
_____

12-cv-2145 (JGK)

MEMORANDUM OPINION AND ORDER

**JOHN G. KOELTL, District Judge:**

Horace Hampton brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 2007, the petitioner was convicted after a jury trial in the New York State Supreme Court, New York County, of murder in the second degree, in violation of N.Y. Penal Law § 125.25[1]; attempted murder in the second degree, in violation of N.Y. Penal Law. § 110.00/§ 125.25[1]; criminal possession of a weapon in the second degree, in violation of N.Y. Penal Law § 265.03[1][b]; and reckless endangerment in the first degree, in violation of N.Y. Penal Law § 120.25. The petitioner was adjudicated to be a second felony offender and sentenced principally to imprisonment for the indeterminate term of thirty-five years to life.

In support of this petition, the petitioner contends that: (1) new evidence establishes the petitioner's actual innocence; (2) the prosecution introduced false testimony at trial in violation of Napue v. Illinois, 360 U.S. 264 (1959); (3) the

petitioner's counsel at trial rendered ineffective assistance of counsel; (4) various errors at trial deprived the petitioner of his constitutional right to a fair trial; and (5) the cumulative errors in this case deprived the petitioner of a fair trial. For the reasons explained below, the petition for a writ of habeas corpus is **denied**.

## I.

The following summary recounts the factual background of this case as reflected by the record only so far as is necessary to understand the current decision.[1]

## A.

On January 19, 2006, at about 8:20 p.m., O'Shay Mitchell and Lloyd Ashe were shot outside a bodega located at the corner of 131st Street and Fifth Avenue in Manhattan, New York. Trial Transcript ("Tr.") at 11-13, 171-73, 443-44, ECF Nos. 50-1, 50-2, 50-3. Mitchell was hit with multiple bullets and died almost immediately. See id. at 12, 17-18. Ashe was shot in the knee, received medical treatment, and survived. Id. at 309-14. Those in the vicinity of the shooting included Dwayne Rose and Matthew Martin. At least one person—Melissa Figueroa—was a direct eyewitness to the shooting.

---

[1] Unless otherwise noted, the procedural history of the petitioner's case in state court, including his various post-conviction applications, is reflected by the documents appended to the People's Answer, ECF Nos. 48-1 to 48-20.

On January 30, 2006, thirteen-year-old Dwayne Rose came into a police precinct with his father and gave a written statement to a detective. Id. at 502-05. That statement indicated that, on the night of the shooting, Rose saw the petitioner arguing with Mitchell with no one else around before the shooting occurred. Id. at 503-05. The statement also indicated that Rose was standing outside the bodega when Rose heard the gunshots. Id.

At the precinct that day, the detective also showed Rose a computer-generated photo array consisting of six photographs. Supp. Hr'g Tr. at 5-6, ECF No. 50. The petitioner's photo was included in the array. Id. Within seconds after viewing the array, Rose identified the petitioner as the person Rose saw arguing with Mitchell on January 19, 2006, just prior to the shots being fired. Id. at 7, 10.

On February 7, 2006, at the New York County District Attorney's ("DA's") office, the same detective showed Melissa Figueroa a virtually identical photo array. Id. at 11-12. Within seconds after viewing the array, Figueroa identified the petitioner as the person she saw shoot Mitchell on January 19, 2006. Id. at 13-14.

On March 26, 2006, the petitioner was arrested. Tr. at 343. In a live lineup conducted the next day, March 27, 2006,

Figueroa identified the petitioner as the man who had shot Mitchell. Id. at 68, 345–46; Supp. Hr'g Tr. at 41.

The prosecution proceeded to a grand jury hearing. See Martin Grand Jury Testimony, ECF No. 48-15 Ex. G. At that hearing, Matthew Martin testified that, on the night of the shooting:

- Martin first saw the petitioner and Mitchell arguing with each other as Martin entered into the bodega;

- Martin heard about six gunshots while in the bodega;

- Martin then saw the petitioner running away from Mitchell after the shots were fired, as Mitchell lay on the ground bloody and shaken.

Id. at 49–56. Martin also testified that he knew Ashe but did not see him that evening. Id. at 57–58.

By New York County Indictment Number 1642/06, filed on April 13, 2006, the grand jury charged the petitioner with murder in the second degree, attempted murder in the second degree, criminal possession of a weapon in the second degree, and reckless endangerment in the first degree.

The petitioner subsequently moved to suppress Melissa Figueroa's identification testimony. After a hearing pursuant to United States v. Wade, 388 U.S. 218 (1967), the suppression motion was denied. Supp. Hr'g Tr. at 68. Having "viewed the photograph" of the lineup, the trial court "found that the appearance of the people in the lineup was substantially

4

similar." Id. All of the participants in the lineup seemed to the trial court "to have some amount of facial hair or growth on their faces or at least enough to make the lineup not unnecessarily suggestive." Id. The trial court therefore found that "the lineup was conducted in a fair and impartial way." Id.

On April 16, 2007, the petitioner proceeded to trial. The People called various witnesses, including Melissa Figueroa, Matthew Martin, and Dwayne Rose.

Figueroa testified for the People that:

- Figueroa had seen the petitioner and Mitchell talking on the sidewalk both as she went into and exited the bodega.

- A few seconds after exiting the bodega, Figueroa heard what sounded to her like firecrackers coming from the street corner.

- Figueroa looked over and saw the petitioner with a gun in his outstretched hand, firing at Mitchell.

Tr. at 49, 52–56. During her in-court testimony, Figueroa identified the petitioner as the shooter. Id. at 54. Figueroa also confirmed her prior lineup identification of the petitioner. Id. at 62, 68–70. But Figueroa said that the petitioner was the only person in the lineup that had been seated. Id. at 67–68, 114. Later during the trial, the detective who conducted the lineup testified that all lineup participants had been seated. Id. at 502.

Martin testified, consistent with his grand jury testimony, that:

- As Martin entered the bodega on the night of the shooting, Martin saw the petitioner, an acquaintance of twenty years, talking to the petitioner's friends on the street. Id. at 238–42.

- Martin then heard the shots while inside the bodega, went outside, and saw the petitioner running in one direction while "pulling his pants up"; everyone else on the street was running in the other direction. Id. at 242–44.

Martin also stated that he was testifying pursuant to a cooperation agreement with the prosecution for criminal conduct unrelated to the shooting that required Martin to testify truthfully in exchange for the prosecutor's recommending a lower sentence for Martin. Id. at 232, 249.

The People also called Dwayne Rose. Contradicting the earlier written statement, Rose testified that he was inside the bodega when he heard the gunshots, and that he neither saw the petitioner talking to Mitchell on the night of the shooting nor saw the petitioner at any time that night. Id. at 442–43, 446, 463. Rose also provided testimony that placed in doubt the veracity of his earlier written statement. See id. at 445–47, 457–59. Because Rose's testimony damaged the prosecution's case, the trial court permitted the prosecution to impeach Rose with his prior inconsistent statement pursuant to New York Criminal Procedure Law ("CPL") § 60.35. See id. at 446–47; see also id.

505-06 & 614-15 (trial court providing instruction that
impeachment evidence is "not evidence of the ultimate facts" and
"may only be considered by the jury in determining the degree of
credibility [the jury] wish[es] to give to the witness'[s] trial
testimony").

The petitioner presented no evidence at trial. Id. at 530-
31. Instead, during summation, counsel for the petitioner argued
that the prosecution's case was insufficient to prove the
petitioner's guilt beyond a reasonable doubt. Id. at 555.
Attacking Figueroa's testimony, the defense counsel argued that
"[w]hat's in [Figueroa's] mind is not reality" because "all six
people [were] seated" but "that's not what [Figueroa] saw." Id.
at 562-63. Attacking Martin's testimony, the defense counsel
emphasized Martin's prior criminal history and argued that the
cooperation agreement required Martin to testify against the
petitioner. Id. at 566-67. Attacking Rose's prior inconsistent
statement implicating the petitioner, the defense counsel argued
that the detective had coerced Rose to provide the written
statement. Id. at 570-72.

On April 25, 2007, the jury convicted the petitioner on all
the charged counts. Id. at 679-83. On May 18, 2007, the
petitioner was adjudicated to be a second felony offender and
the trial court sentenced the petitioner principally to

imprisonment for the indeterminate prison term of thirty-five years to life. See ECF No. 48-1 at 1.

The petitioner appealed to the Appellate Division, First Department, claiming that the trial evidence was insufficient to establish his attempted murder of Ashe. The petitioner also argued that the trial court had mishandled the trial in various ways and that the prosecutor had overstepped the bounds of proper advocacy by trying to appeal to the jurors' emotions. The First Department unanimously affirmed the petitioner's conviction, People v. Hampton, 899 N.Y.S.2d 240 (App. Div. 2010), and leave to appeal to the New York Court of Appeals was denied. People v. Hampton, 949 N.E.2d 979 (N.Y. 2011).

**B.**

Subsequently, on March 22, 2012, the petitioner filed a petition for a writ of habeas corpus in this Court, raising the same claims he had raised on direct appeal. ECF No. 1. The petition was subsequently stayed to allow the petitioner to exhaust his state remedies. See ECF No. 27.

**1.**

In 2012, and again in 2014, the petitioner applied for a writ of error coram nobis in state court, claiming each time that his appellate counsel had provided him with constitutionally deficient representation. Both times, the First

Department denied his application and leave to appeal to the
Court of Appeals was denied.

### 2.

In July 2014, the petitioner moved in state court to vacate
his conviction pursuant to CPL § 440.10, claiming that his trial
counsel had been ineffective because the trial counsel, among
other things, failed to reopen the Wade suppression hearing
after Figueroa's trial testimony and failed to consult with and
call an identification expert. In December 2014, the court
denied the petitioner's application. The petitioner sought
reconsideration, which the court denied in April 2015. The
petitioner then sought an extension of time to seek leave to
appeal the denial of reconsideration. The First Department
denied that request in October 2015.

### 3.

In July 2018, the petitioner moved again in state court to
vacate his conviction pursuant to CPL § 440.10. This time, the
petitioner offered two statements by Martin recanting Martin's
trial testimony that had implicated the petitioner in Mitchell's
murder. In November 2019, the petitioner filed a supplemental
motion alleging that newly discovered evidence—Martin's
recantation and an expert report on eyewitness identification—
established the petitioner's actual innocence of the shooting.

The petitioner also argued that he had received constitutionally ineffective assistance of counsel.

In July and August 2021, the court held a hearing on the petitioner's second CPL § 440.10 motion (the "440.10 Hearing"). 440.10 Hr'g Tr., ECF Nos. 50-4, 50-5; Cont. 440.10 Hr'g Tr., ECF No. 50-6. The petitioner called two witnesses. The first witness was Doctor Margeret Kovera, a professor of psychology at the City University of New York. 440.10 Hr'g Tr. at 4. Kovera opined, in brief, that the "witnessing conditions" and "grossly unfair" procedures "would likely [have] contribute[d] to a mistaken identification" by Figueroa because many variables limited Figueroa's "ability to encode" and also "create[d] a suggestive environment at the time of [her memory] retrieval." Id. at 17–18, 30–31. For example, Kovera claimed that the petitioner was the only person with facial hair placed in the lineup conducted on March 27, 2006. Id. at 27. But at the 440.10 Hearing, after examining a color photo of the lineup for the first time, Kovera acknowledged that the other men in the lineup also had facial hair. Id. at 84–87. At bottom, Kovera was unable to tell whether any individual's identification of the petitioner as the shooter was "accurate or not," and Kovera was unable to say that any factors made Figueroa's identification "unreliable at the time" it was made. Id. at 30–31.

The petitioner's second witness was Matthew Martin. Id. at
115. At this hearing, Martin recanted his previous testimony
against the petitioner. Specifically, Martin testified that:

- Martin had never seen the petitioner outside when
  there was a shooting. Id. at 122, 134.

- Martin's trial testimony was false. Id. at 134.

- After Lothel Crawford, a private investigator,
  contacted Martin through a friend, Martin met with
  Crawford (who Martin thought was a lawyer). Id. at
  125-26, 129. At that first meeting, which took place
  at a park playground, Martin wrote and signed a
  statement recanting his previous testimony against
  the petitioner. Id. at 125-28, 130-31. Martin and
  Crawford then went to a drugstore to have the
  statement notarized. Id. at 127. Martin said
  initially that the meeting occurred in 2005, but
  then admitted that he did not remember in which year
  the meeting occurred. Id. at 132-33.

- After Martin was arrested for unrelated crimes in
  January 2007, Tom Schellhammer, the assistant
  district attorney ("ADA") who had prosecuted the
  petitioner's case, came to "Central Booking" and
  threatened Martin, "If you don't cooperate"—by
  testifying falsely against the petitioner—"you and
  your family will go down with this," meaning that
  the family would be "put out the [housing]
  projects." Id. at 190-96. During this alleged
  conversation in Central Booking, Martin was high on
  "[c]rack cocaine" and "liquor." Id. at 194.

The People also called two witnesses. First to testify was
Jeffrey Meehan, a former investigative analyst at the DA's
office. Id. at 214. Meehan testified that, on or about May 9,
2019, Martin was interviewed at the DA's office, while seemingly
sober. Id. at 219, 232, 242. Meehan and two ADAs attended the
interview; Meehan took notes as one of the ADAs asked Martin

11

questions. Id. at 216-20, 226-30. Meehan testified that, during this 2019 interview:

- Martin said that he testified truthfully at the petitioner's trial. Id. at 220, 240-41.

- Martin reaffirmed that, on January 19, 2006, Martin was in the bodega when "he heard gunshots, and he looked out a window and saw [the petitioner] running away from the scene." Id. at 220.

- Martin stated that ADA Schellhammer had not told Martin what to say at the petitioner's trial. Id. at 220, 240-41.

- Martin said that Martin had met Crawford several times but had no intention of rescinding his testimony or going back on anything that Martin had testified to in the petitioner's case. Id. at 220-21.

The People's second witness was ADA Schellhammer. Cont. 440.10 Hr'g Tr. at 3. Schellhammer testified regarding Martin's cooperation agreement that:

- Martin had not been coerced into entering the cooperation agreement. Id. at 7-12; 28-36.

- The cooperation agreement required Martin to tell the truth (at the risk of incurring additional penalties in the event of a violation). Id. at 22.

Schellhammer further testified regarding his investigation that:

- Schellhammer was assigned to Mitchell's murder almost immediately after the shooting occurred. Id. at 15-18. Within about a week, Schellhammer had determined through various informants that the petitioner was the shooter. Id. at 15-18, 41-44, 48.

- Martin had called Schellhammer first to tell Schellhammer that Martin had witnessed the shooting and that the petitioner was the shooter. Id. at 18.

- Schellhammer never directed Martin to say that the petitioner committed the murder, but rather "told him to tell the truth." Id. at 19-22, 24-25, 36, 41.

- Martin testified before the grand jury of his own accord before he was subsequently arrested on an unrelated crime—the arrest which led to the alleged occasion for Schellhammer's coercion of Martin. See id. at 18-21, 23, 26, 36.

- Ultimately, what Martin had told Schellhammer "jived from what [Schellhammer] knew from the crime scene and from other witnesses," and thus Schellhammer "put [Martin] on the stand." Id. at 54-57. Only Martin "kn[ew] whether he [had] lied or not." Id. at 57.

That concluded the People's case.

On rebuttal, the petitioner called Lothel Crawford, the private investigator. 440.10 Hr'g Tr. at 246. Crawford testified that, in about March 2015, he was contacted by a friend of the petitioner. Id. at 249-50. Crawford then agreed to investigate the petitioner's case for a discounted fee. See id. at 250-70. Starting in 2015, Crawford repeatedly contacted Martin—in Crawford's words, "calling him like I was a pest"—and met with Martin several times. Id. at 251-77. According to Crawford, at his third meeting with Martin, which started on the street in the Bronx and continued in Crawford's car, Martin handed Crawford a pre-written statement that Martin had brought to the meeting and that recanted Martin's trial testimony. Id. at 253-55, 275-77. Crawford said he then took Martin to get the statement notarized, and Martin signed the statement in the notary's presence. Id. at 255.

13

On January 3, 2022, the court denied the petitioner's second CPL § 440.10 motion. 440.10 Dec. at 4, 8, ECF No. 48-18. In doing so, the court found that "Martin's recantation is wholly unreliable, riddled with inconsistencies and in some respects incredible on the merits and unbelievable." Id. at 4. This was because, among other reasons, Crawford had contacted Martin repeatedly and met with Martin several times to procure Martin's recantation. Id. at 4-5. Regarding Martin's allegations against ADA Schellhammer, the court noted that Martin had testified at the grand jury hearing months before Martin's January 2007 arrest that landed him in Central Booking. Id. at 5. Moreover, the court found it "incredible that ADA S[c]hellhammer would go to Central Booking, a public and busy location, to coerce and threaten a witness to lie." Id. Regarding Kovera, the court found that "Kovera's testimony in no way established that Melissa Figueroa's identification was inaccurate" because, among other reasons, "Kovera testified that she could not say whether any of the factors that lead to misidentifications in general were present with [Figueroa's] identification." Id. at 6. Finally, finding that the petitioner's "trial counsel represented [the petitioner] zealously," the court determined "that the defendant received the representation that he was entitled to under both federal and state standards." Id. at 7.

14

On April 21, 2022, the First Department denied the
petitioner's application for leave to appeal the court's
decision denying the petitioner's second CPL § 440.10
application. <u>People v. Hampton</u>, 2022 N.Y. Slip Op. 64777(U)
(App. Div. Apr. 21, 2022) (motion decision).

### C.

Meanwhile, this Court had closed this case because of
inactivity, subject to re-opening within thirty days after the
petitioner had exhausted his state remedies. ECF No. 29. On May
20, 2022, this Court granted the petitioner leave to file an
amended petition. ECF No. 35. On July 17, 2022, the petitioner
filed the amended petition. ECF No. 36. That petition is now
ready for decision.

### II.

A state prisoner may petition a federal court for a writ of
habeas corpus, but the writ may issue "only on the ground that
[the prisoner] is in custody in violation of the Constitution or
laws or treaties of the United States." 28 U.S.C. § 2254(a).[2] And
pursuant to the Antiterrorism and Effective Death Penalty Act of
1996 ("AEDPA"), § 2254(d):

> An application for a writ of habeas corpus on behalf of
> a person in custody pursuant to the judgment of a State
> court shall not be granted with respect to any claim

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits
all internal alterations, citations, footnotes, and quotation
marks in quoted text.

> that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006) (discussing deference under AEDPA to state court adjudications). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 562 U.S. 86, 99 (2011).

Under § 2254(d)(1), the "contrary to" and "unreasonable application" clauses have independent meaning. Williams v. Taylor, 529 U.S. 362, 404 (2000). The "contrary to" clause is met "if the state court arrives at a conclusion opposite to" the holding of the Supreme Court "on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Supreme Court's holding. Id. at 405. The "unreasonable application" clause is met when the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular

16

prisoner's case." Id. at 407–08. The unreasonable application standard is objective and "requires the state court decision to be more than incorrect or erroneous." Lockyer v. Andrade, 538 U.S. 63, 75 (2003). "The prisoner must show that the state court's decision is so obviously wrong that its error lies beyond any possibility for fairminded disagreement." Shinn v. Kayer, 592 U.S. 111, 118 (2020).

AEDPA's second prong, § 2254(d)(2), is also difficult to meet. The state court's factual determinations are "presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the [state] court's determination." Brumfield v. Cain, 576 U.S. 305, 314 (2015). This presumption of correctness is "particularly important when reviewing the [state] court's assessment of witness credibility." Cotto v. Herbert, 331 F.3d 217, 233 (2d Cir. 2003).

### III.

The petitioner makes five claims in support of his amended petition for a writ of habeas corpus. Under AEDPA's stringent provisions, and for the additional reasons explained below, none of the petitioner's claims have merit.

**A.**

The petitioner first brings a freestanding claim of actual innocence, claiming that the evidence presented at the 440.10 Hearing established his actual innocence of the January 19, 2006 shooting and related crimes. Pet'r's Mem. of Law ("Br.") 4-16, ECF No. 37. The People argue in response that, even assuming that such a claim is available, the petitioner failed to present sufficient evidence to establish actual innocence. People's Mem. of Law ("Opp.") 69-89, ECF No. 49.

"The Supreme Court has never recognized a freestanding claim of actual innocence." Jimenez v. Stanford, 560 F. Supp. 3d 761, 768 (S.D.N.Y. 2021). Assuming arguendo that such a claim exists, "the threshold showing for such an assumed right would necessarily be extraordinarily high." Gross v. Graham, 802 F. App'x 16, 20 (2d Cir. Feb. 11, 2020) (summary order). This is because "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." Herrara v. Collins, 506 U.S. 390, 399 (1993). "Thus, even new evidence that casts considerable doubt on a defendant's guilt, such that no reasonable juror could find the defendant guilty beyond a reasonable doubt, is not enough." Jimenez, 560 F. Supp. 3d at 769. Moreover, under § 2254(d), the petitioner must "also demonstrate that the state court's conclusion that [the

petitioner] failed to [establish actual innocence] was unreasonable." Id.

In this case, the petitioner has failed to put forth evidence that could sustain a freestanding claim of actual innocence, even assuming arguendo that such a claim is proper. The petitioner's evidence failed to demonstrate the petitioner's actual innocence by a preponderance of the evidence, much less the "extraordinarily high" bar that the petitioner must clear to make such a showing. See Gross, 802 F. App'x at 20. Moreover, the petitioner has failed to establish any unreasonableness in the state court's decision denying the petitioner's second CPL § 440.10 motion.

Taking each of the petitioner's principal witnesses in turn, Martin's recantation failed even to undermine the credibility of Martin's previous testimony. As the state court found, Martin's recantation testimony was "riddled with inconsistencies and in some respects incredible on the merits and unbelievable." 440.10 Dec. at 4. For example, Martin testified that he wrote and signed the recantation statement in Crawford's presence at their first meeting. 440.10 Hr'g Tr. at 125-28, 130-31. This was contradicted not only by Crawford, who testified that Martin brought the statement, pre-written, to their third meeting, id. at 253-55, and that Crawford had to contact Martin repeatedly and meet with him several times before

19

he recanted, id. at 251–58, 275–77, but also by Martin's own account provided to prosecutors in 2019 that Martin had met with Crawford several times, id. at 220–22. Moreover, Martin's testimony that ADA Schellhammer threatened and coerced Martin to lie—at Central Booking, a public and busy place—defied not only the sequence of events whereby Martin had testified at the grand jury hearing many months before his January 2007 arrest, but also common sense. 440.10 Dec. at 5. Further, Martin denied to prosecutors in 2019 that Schellhammer had coerced him and Schellhammer also denied doing so. 440.10 Hr'g Tr. at 220, 240–41; Cont. 440.10 Hr'g Tr. at 19–25, 36, 41. It was therefore reasonable for the court to determine that Martin's recantation was "wholly unreliable." Id. at 4; see also Haouari v. United States, 510 F.3d 350, 353 (2d Cir. 2007) ("It is axiomatic that witness recantations must be looked upon with the upmost suspicion.") (collecting cases).

As for Kovera, Kovera was unable to say that any eyewitness identification factors made Figueroa's identification unreliable. 440.10 Hr'g Tr. at 30–31. Moreover, at trial, Figueroa was vigorously cross-examined, Tr. at 91–125, and the presiding judge advised the jury about the various factors to be considered in assessing the "reliability and accuracy" of the eyewitness testimony presented by the People, id. at 621–24. Therefore, in denying the petitioner's second CPL § 440.10

motion, the state court reasonably determined that Kovera's testimony did not support a claim of actual innocence.

In sum, reviewing the evidence as a whole, the petitioner has "not demonstrated that the newly discovered evidence would be sufficient to satisfy the high standard for a freestanding innocence claim." See Gross, 802 F. App'x at 20. Moreover, "[a]pplying the deferential standard of review in § 2254(d)," the state court's denial of the petitioner's second CPL § 440.10 motion "was not unreasonable." Jimenez, 560 F. Supp. 3d at 771. Relief must therefore be denied on this claim.

**B.**

The petitioner's second claim is that ADA Schellhammer knew or should have known Martin's testimony to be false, but nevertheless presented Martin's testimony at the petitioner's trial, in violation of the petitioner's right to due process under the Fourteenth Amendment. Br. at 16-21. The People contend that the state court's rejection of this claim was not an unreasonable application of settled law or an unreasonable determination of the facts based on the evidence presented at the 440.10 Hearing. Opp. at 89-91.

"Supreme Court holdings have long established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." Drake v. Portuondo, 553 F.3d 230, 240 (2d

21

Cir. 2009). "The same result obtains when the State, although
not soliciting false evidence, allows it to go uncorrected when
it appears," even if "the false testimony goes only to the
credibility of the witness." Napue v. Illinois, 360 U.S. 264,
269 (1959). Therefore, under "the clearly established Supreme
Court precedent," a conviction must be overturned if: "(1) the
prosecution actually knew of [the witness's] false testimony,
and (2) there is any reasonable likelihood that the false
testimony could have affected the judgment of the jury." See
Drake, 553 F.3d at 241.

Because the petitioner presented this claim to the state
court, ECF No. 48-15 at 20-25, "it may be presumed that the
state court adjudicated the claim on the merits." Richter, 562
U.S. at 99. Therefore, under AEDPA, the petitioner must show
that the state court either unreasonably applied Napue or that
the state court based its decision on an unreasonable
determination of the facts in light of the evidence presented at
the 440.10 Hearing. 28 U.S.C. § 2254(d).

In rejecting the petitioner's claim, the state court
reasonably determined the facts and correctly applied Napue.
Considering Martin's recantation against the testimony of ADA
Schellhammer and Jeffrey Meehan, the state court reasonably
found that Martin's recantation was "wholly unreliable" and by
extension, that ADA Schellhammer had not knowingly or

22

negligently provided false testimony. See 440.10 Dec. at 4.
Martin had provided testimony at trial consistent with his grand
jury testimony, and ADA Schellhammer testified at the 440.10
Hearing that Martin's trial testimony "jived from what
[Schellhammer] knew from the crime scene and from other
witnesses." Cont. 440.10 Hr'g Tr. at 54-57. The petitioner also
relies on Schellhammer's comment that only Martin "kn[ew]
whether he [had] lied or not," id. at 57, but this comment
followed Schellhammer's statement that when he put Martin on the
stand, Martin's testimony "jived" with what Schellhammer knew
from the crime scene and other witnesses. Thus, there was no
evidence that Schellhammer knowingly presented false testimony
or knowingly allowed false testimony to go uncorrected when it
appeared, in violation of Napue. See Glossip v. Oklahoma, 145 S.
Ct. 612, 626 (2025) ("To establish a Napue violation, a
defendant must show that the prosecution knowingly solicited

false testimony or knowingly allowed it to go uncorrected when it appeared.").[3]

Accordingly, the petitioner's habeas challenge based on his Napue claim is without merit.

## C.

The petitioner's third claim is that his trial counsel rendered constitutionally ineffective assistance of counsel. Br. at 21-27. The petitioner contends specifically that defense counsel failed to adhere to professional standards by: (1) not consulting or calling an identification expert to challenge Figueroa's identification of the petitioner, and (2) not reopening the Wade hearing after Figueroa's trial testimony. Id.

---

[3] In applying Napue, the Second Circuit Court of Appeals has stated that "if the prosecution 'knew or should have known of a witness's perjury, a new trial is warranted if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Alston, 899 F.3d 135, 146 (2d Cir. 2018) (quoting United States v. Wong, 78 F.3d 73, 81 (2d Cir. 1996)). But the Second Circuit Court of Appeals has also determined that the "should have known" portion of the rule relies on the Supreme Court's decision in United States v. Agurs, 427 U.S. 97, 103 (1976), and "identified the 'should have known' language in Agurs as dicta." Drake, 553 F.3d at 240 (citing Drake v. Portuondo, 321 F.3d 338, 345 (2003)). "Clearly established Federal law . . . refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. Accordingly, the "should have known" prong of the Napue test that might apply today in the Second Circuit is not clearly established Federal law for purposes of the current petition. In any event, the petitioner has failed to show that ADA Schellhammer should have known that Martin's trial testimony was false because the petitioner has failed to show that Martin's trial testimony was in fact false.

The People argue in response that the state court determined reasonably that the petitioner received constitutionally adequate representation. Opp. at 92-102.

Claims of ineffective assistance of counsel are evaluated under the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984). "An ineffective assistance claim has two components: A petitioner must show that [1] counsel's performance was deficient, and [2] that the deficiency prejudiced the defense." Wiggins v. Smith, 539 U.S. 510, 521 (2003).

"To establish deficient performance, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness." Richter, 562 U.S. at 104. The bar is "high": the petitioner must establish that his counsel "made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment." LanFranco v. Murray, 313 F.3d 112, 118 (2d Cir. 2002). Courts therefore "apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." Richter, 562 U.S. at 104.

To establish prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." <u>Strickland</u>,
466 U.S. at 694. In assessing prejudice, courts consider the
cumulative effect of counsel's unprofessional errors. <u>Lindstadt
v. Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001).

"Surmounting <u>Strickland</u>'s high bar is never an easy task."
<u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "Establishing
that a state court's application of Strickland was unreasonable
under § 2254(d) is all the more difficult." <u>Richter</u>, 562 U.S. at
105. Where, as here, the state court has rejected the
petitioner's <u>Strickland</u> claim on the merits, the petitioner must
show that the state court reached a decision "that was contrary
to" or that unreasonably applied <u>Strickland</u>. <u>See</u> 28 U.S.C. §
2254(d)(1). "When § 2254(d) applies, the question is not whether
counsel's actions were reasonable. The question is whether there
is any reasonable argument that counsel satisfied <u>Strickland</u>'s
deferential standard." <u>Richter</u>, 562 U.S. at 105.

In this case, there is no reasonable argument that
counsel's representation satisfied <u>Strickland</u>'s deferential
standard of unreasonableness. First, counsel's decision not to
present or consult an identification expert was neither
unreasonable nor prejudicial. "Courts applying <u>Strickland</u> are
especially deferential to defense attorneys' decisions
concerning which witnesses to put before the jury." <u>Greiner v.
Wells</u>, 417 F.3d 305, 323 (2d Cir. 2005). In this case, as in

26

others, the "skillful cross examination of eyewitnesses, coupled with appeals to the experience and common sense of jurors," was sufficient to "alert jurors to specific conditions that render a particular eyewitness identification unreliable." See Howard v. Clark, 608 F.3d 563, 574 (9th Cir. 2010). "[E]ven more significantly, the jurors were instructed [by the trial court] on the potential shortcomings of eyewitness testimony." Id.

At the petitioner's trial, instead of calling an identification expert, defense counsel vigorously cross-examined eyewitnesses, including Figueroa and Martin. For example, defense counsel brought out through cross-examination that Figueroa was "scared, frightened, [and] terrified" during the shooting; at one point, Figueroa even thought that one of her children had been shot. Tr. at 105-07, 111. And trial counsel used Figueroa's recollection of the lineup which contradicted the law enforcement officer's testimony to cast doubt on her recollections. Id. at 562-63, 578. Moreover, the trial court warned the jury to consider various factors in assessing the "reliability and accuracy" of the eyewitness testimony presented by the People. Id. at 621-24. In any case, at the 440.10 Hearing, Kovera could not even testify that Figueroa's identification was "unreliable at the time" it was made. 440.10 Hr'g Tr. at 30-31. And there is no showing that consultation with an eyewitness identification expert was needed to develop

cross-examination of the eyewitness. Therefore, with respect to counsel's decision not to consult or call an identification witness, the petitioner has failed to demonstrate both deficient performance and prejudice.

Second, counsel's decision not to reopen the Wade hearing did not constitute objective error. "There are countless ways to provide effective assistance in any given case." Strickland, 466 U.S. at 689. Accordingly, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. In this case, the petitioner cannot "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." See id.

During direct examination, Figueroa mentioned that the lineup participants "were all standing facing towards" her but that the petitioner "was sitting down and not facing" towards her. Tr. at 67–68. The defense counsel reinforced this testimony through cross-examination by asking Figueroa, "Did you say that several people were standing and one person was sitting at the lineup?" Id. at 114. Figueroa answered, "Yes." Id. Later, in summation, counsel used Figueroa's testimony to argue that "[w]hat's in [Figueroa's] mind is not reality" because "all six people [were] seated" but "that's not what [Figueroa] saw." Id. at 562–63. Thus, counsel continued, the jurors "cannot rely on

28

[Figueroa]" because she had either "pick[ed] out a guy in a lineup who didn't exist," or "pick[ed] out a guy that did exist in the most unfair lineup in the world." Id. at 578. In short, counsel used Figueroa's remark to attack the reliability of her recollection rather than to reopen the Wade hearing. That "strategy choice was well within the range of professionally reasonable judgments." See Strickland, 466 U.S. at 699. This is particularly true because the trial court had already determined that the Wade hearing was fair.

In sum, the petitioner has failed to show that his trial counsel's performance fell below an objective standard of reasonableness. See id. Moreover, the lack of an identification expert at trial did not prejudice the petitioner. Howard, 608 F.3d at 574. Thus, in denying the petitioner's second CPL § 440.10 motion, the state court reasonably applied Strickland in holding that the petitioner received constitutionally sufficient representation. Accordingly, the petitioner is not entitled to relief on his Strickland claim.

### D.

The petitioner's fourth claim is that prosecutorial misconduct throughout his trial deprived him of due process. Br. at 27-41. The petitioner contends that the prosecutor acted improperly at his trial by:

- (1) calling Rose for the purpose of impeaching Rose with his prior inconsistent statement and then urging the jury during summation to view that prior statement as substantive evidence of the petitioner's guilt;

- (2) introducing irrelevant and allegedly inflammatory background evidence about the murder victim, including a photograph of Mitchell while he was still alive; and

- (3) appealing to the jurors' emotions during opening and closing statements.

Id. The People argue that this fourth claim fails for two reasons: (1) the state court rejected two of these arguments on direct appeal based on independent and adequate state grounds; and (2) AEDPA deference bars relief. Opp. 103-13.

**1.**

On direct appeal from the petitioner's conviction, the petitioner made the same three claims of prosecutorial misconduct. Hampton, 899 N.Y.S.2d at 241-42. The First Department rejected his claims in part based on the contemporaneous objection rule. Id. Under the "firmly established and regularly followed" New York contemporaneous objection rule, an objection is preserved for appellate review only "if the objecting party (1) made his or her position regarding the ruling known to the trial court; (2) made a protest, and the trial court 'expressly decided the question raised on appeal'; or (3) 'without success . . . either expressly or impliedly sought or requested a particular

ruling.'" <u>Downs v. Lape</u>, 657 F.3d 97, 102-04 (2d Cir. 2011)
(quoting CPL § 470.05[2]).

The First Department first held that the contemporaneous
objection rule barred review of the petitioner's "claim that the
People demonstrated bad faith by calling [Rose] for the sole
purpose of impeaching him" and "decline[d] to review [the claim]
in the interest of justice." <u>Hampton</u>, 899 N.Y.S.2d at 241-42. In
the alternative, the court determined that: (1) "the People had
a legitimate basis for calling [Rose]," (2) the trial court
meaningfully and correctly instructed the jury regarding the
limits on impeachment evidence, and (3) "any errors relating to
[Rose] were harmless." <u>Id.</u>

The First Department next concluded that the background
testimony about and related photograph of Mitchell "were
irrelevant and should not have been received in evidence." <u>Id.</u>
at 242. The court, however, found that "this error was
harmless." <u>Id.</u>

The First Department also rejected the petitioner's
challenge to the prosecutor's opening and closing remarks
pursuant to the contemporaneous objection rule. <u>Id.</u> The court
alternatively rejected the claim "on the merits," concluding
that "[a]lthough the prosecutor's summation contained some
improprieties, they did not deprive [the petitioner] of a fair
trial." <u>Id.</u>

**2.**

Two of the petitioner's arguments fail at the threshold. "A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Beard v. Kindler, 558 U.S. 53, 55 (2009). Procedural default under state law provides such an independent and adequate state law ground. Harris v. Reed, 489 U.S. 255, 262 (1989). The procedural bar applies even where the state court has "ruled in the alternative on the merits of the federal claim." Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990). To overcome the procedural bar and obtain federal habeas review, a state prisoner must demonstrate: (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law," or (2) "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991).

The petitioner cannot obtain federal habeas review of his arguments concerning Rose and the prosecutor's remarks during opening statement and summation because the First Department rejected both arguments based on the contemporaneous objection rule, an independent and adequate state law ground. See Garcia v. Lewis, 188 F.3d 71, 78 (2d Cir. 1999). And the petitioner has not attempted to overcome the procedural bar by invoking either

cause and actual prejudice or the fundamental miscarriage of justice exception.[4] Accordingly, the petitioner's complaints concerning Rose and the prosecutor's remarks must be rejected at the threshold. See Holder v. Lamanna, No. 18-cv-7431, 2020 WL 804902, at *7-8 (E.D.N.Y. Feb. 18, 2020) (claim of prosecutorial misconduct during summation precluded from federal habeas review because the Appellate Division had ruled that the contemporaneous objection rule barred direct review); Mitchell v. Sheahan, No. 12-cv-3182, 2015 WL 5089138, at *6 (E.D.N.Y. Aug. 27, 2015) (same for claim that the prosecutor was permitted to elicit improper testimony from own witness).

**3.**

Moreover, each of the petitioner's claims regarding prosecutorial misconduct fails on the merits. Because the First Department addressed and rejected the merits of the petitioner's arguments charging prosecutorial misconduct, AEDPA's deferential standard applies. See 28 U.S.C. § 2254(d).

Prosecutorial misconduct warrants federal habeas relief only when the prosecutor's misleading or deceptive conduct or

---

[4] Any implicit reliance by the petitioner on the fundamental miscarriage of justice exception is without merit because the petitioner has failed to prove actual innocence. The Supreme Court has "emphasized the narrow scope of the fundamental miscarriage of justice exception" and explained that the exception "is concerned with actual as compared to legal innocence." Sawyer v. Whitley, 505 U.S. 333, 339-40 (1992).

remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." See Darden v. Wainwright, 477 U.S. 168, 181 (1986). In determining whether the prosecutor's conduct at trial denied the petitioner due process, courts examine "the entire proceedings." See Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).

In rejecting the petitioner's claims of prosecutorial misconduct, the First Department reasonably applied clearly established Federal law and reasonably determined the facts. The petitioner's first argument was that the prosecutor called Rose in violation of CPL § 60.35, a statute that permits a party to impeach its own witness only when the witness has given material and damaging testimony against that party. The First Department's decision did not involve an unreasonable application of clearly established Federal law because "[n]either the Supreme Court nor the Second Circuit [Court of Appeals] has held that a prosecutor's impeachment of [the prosecutor's] own witness may violate a criminal defendant's due process rights." Escobar v. Senkowski, No.2-cv-8066, 2005 WL 1307939, at *12 (S.D.N.Y. May 26, 2005), report and recommendation adopted as modified, 2005 WL 2148712 (S.D.N.Y. Sept. 7, 2005). Moreover, it was reasonable for the First Department to determine that the People "had a legitimate basis for calling the witness." Hampton, 899 N.Y.S.2d at 242. Prior to

trial, Rose had provided out-of-court testimony that had implicated the petitioner as the shooter, Tr. at 502-05, and identified the petitioner in a photo array, Supp. Hr'g Tr. at 5-7, 10. The First Department also reasonably held that the trial court "properly permitted the People to impeach the witness" because Rose's "ultimate trial testimony was affirmatively damaging to the People's case." 899 N.Y.S.2d at 241.

With respect to the petitioner's second argument that the introduction of background evidence about Mitchell constituted error, the First Department ruled that the "error was harmless." Hampton, 899 N.Y.S.2d at 242. On the current petition, AEDPA bars relief because the petitioner cannot "show that the state court's decision is so obviously wrong that its error lies beyond any possibility for fairminded disagreement." See Shinn, 592 U.S. at 118. Because the People produced clear and direct evidence of the petitioner's guilt at trial—including direct eyewitness testimony from Figueroa and corroborating testimony from Martin—it was reasonable for the First Department to conclude that the error was harmless. See, e.g., Meadows v. Kuhlmann, 812 F.2d 72, 77 (2d Cir. 1987) (holding that the erroneous admission of lineup identification evidence was harmless beyond a reasonable doubt).

The petitioner's third argument was that the prosecutor's remarks during the opening statement and summation deprived the

petitioner of due process. The First Department concluded that "[a]lthough the prosecutor's [remarks] contained some improprieties, they did not deprive [the petitioner] of a fair trial." Hampton, 8999 N.Y.S.2d at 242. That determination did not lie beyond "fairminded disagreement." See Shinn, 592 U.S. at 118. "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone in an otherwise fair proceeding." Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991). "In order to reach the level of a constitutional violation, a prosecutor's remarks must so infect the trial with unfairness as to make the resulting conviction a denial of due process." Id. In this case, the state court reasonably applied federal law when it determined that the few improprieties in the prosecutor's remarks did not deprive the defendant of a fair trial. See, e.g., Lamanna, 2020 WL 804902, at *8-10 (collecting cases).

Moreover, even if any or all of the claims of prosecutorial misconduct had merit, the petitioner "would still not be entitled to habeas relief because he has not demonstrated actual prejudice." See id. at *11. In determining whether alleged prosecutorial misconduct caused prejudice, courts consider three factors: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of

conviction absent the improper statements" or misconduct. <u>See</u> <u>United States v. Thomas</u>, 377 F.3d 232, 245 (2d Cir. 2004).

In this case, the People produced substantial evidence proving the petitioner's guilt at trial, including direct eyewitness testimony from Figueroa and corroborating testimony from Martin. The petitioner therefore "cannot demonstrate that he suffered actual prejudice because the [People] presented clear evidence of [the petitioner's] guilt at trial." <u>Sheard v.</u> <u>Lee</u>, No. 18-cv-2125, 2019 WL 5847151, at *8 (S.D.N.Y. Oct. 7, 2019), <u>report and recommendation adopted</u>, 2019 WL 5810306 (S.D.N.Y. Nov. 6, 2019); <u>Dunn v. Sears</u>, 561 F. Supp. 2d 444, 458 (S.D.N.Y. 2008) ("If there is clear evidence of guilt, prosecutorial misconduct on summation is considered harmless error.").

Additionally, the prosecutor's "short and fleeting" comments are unlikely "to have had a substantial effect on the jury's verdict." <u>See</u> <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 253 (2d Cir. 1998). For example, the prosecutor's improper reference to "Mitchell's family who is sitting here [in the courtroom]" was objected to, admonished by the trial court, and not repeated. <u>Tr.</u> at 582–83. Therefore, "the severity of the prosecutor's misconduct . . . was mitigated by the brevity and fleeting nature of the improper comments". <u>Tankleff</u>, 135 F.3d at 253; <u>Dunn</u>, 561 F. Supp. 2d at 456 (severity of improper comments

mitigated where the comments were "brief and isolated" and "not repeated after a sustained objection").

"Any prejudice also was mitigated by the trial court's instructions to the jury [during and] following summation." See Sheard, 2019 WL 5847151, at *9. With respect to Rose, the trial court instructed the jury that "the evidence concerning [Rose's] prior contradictory statement is admitted on a special evidentiary rule and is and can only be used by you to impeach his credibility at trial and does not constitute evidence in chief . . . ." Tr. at 614–15. With respect to Mitchell specifically and appeals to emotion more generally, the trial court issued a curative instruction providing that "emotions or speculation or things that are not in evidence cannot be considered" and that the jury must "decide the case on the facts regardless of whatever [counsel] say[s] in their summation . . . ." Id. at 581–83. The trial court further instructed the jury generally that "if you find that any argument made by an attorney is not based on facts in this record or is inconsistent with the facts, illogical or unreasonable, you can disregard that particular argument entirely." Id. at 605–06.

In sum, the alleged prosecutorial misconduct did not cause substantial prejudice and deprive the petitioner of his right to a fair trial. Moreover, the evidence was not "so closely balanced that the prosecutor's comments were likely to have had

a substantial effect on the jury." See Tankleff, 135 F.3d at 253. Accordingly, the First Department's decision was not an unreasonable application of clearly established Federal law. Nor was the First Department's decision based on an unreasonable determination of the facts. The petitioner's fourth claim is therefore without merit.

**E.**

The petitioner's fifth and final claim is that the cumulative errors in the case deprived the petitioner of a fair trial. Br. at 41. In this Circuit, "the cumulative effect of a trial court's errors, even if they are harmless when considered singly, may amount to a violation of due process requiring reversal of a conviction." United States v. Al-Moayad, 545 F.3d 139, 178 (2d Cir. 2008).[5]

The petitioner's cumulative-error claim is without merit because the petitioner has failed to show "that the alleged individual errors [the] petitioner seeks to aggregate are actually errors." Joyner v. Miller, No. 1-cv-2157, 2002 WL

---

[5] Federal habeas review on a cumulative-error claim is available only where the petitioner presented the claim to the state courts. Jimenez v. Walker, 458 F.3d 130, 149 (2d Cir. 2006). In this case, the record does not clearly show that the petitioner presented his cumulative-error claim to the state courts. See App'x to Answer, Ex. O (Pet'r's Mem. of Law in Support of Second CPL § 440.10 Motion), ECF No. 48-15. Because the parties have not raised this issue, the Court assumes without deciding that the claim was properly presented to the state courts.

1023141, at *13 (S.D.N.Y. Jan. 7, 2002) (collecting cases), report and recommendation adopted, No. 1-cv-2157, ECF No. 16 (S.D.N.Y. Sept. 30, 2002). Moreover, for the reasons discussed above, the petitioner has failed to show that the claimed errors were "so prejudicial that they rendered petitioner's trial fundamentally unfair," as required "for the cumulative effect of errors to warrant a new trial." Id. Accordingly, the petitioner is not entitled to relief on this claim.

**CONCLUSION**

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the foregoing reasons, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **denied.**

The Court declines to issue a certificate of appealability because the petitioner has failed to make a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2).

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk is directed to enter judgment dismissing the petition and closing this case.

**SO ORDERED.**

Dated:     New York, New York
           April 16, 2025

                                        John G. Koeltl
                              United States District Judge